**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** ) | |
| Plaintiff, ) | **Civil Action No. 1:19-cv-3552** |
| v. ) | |
| **GEORGE SLOWINSKI,** ) | |
| Defendant. ) | |

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission ("SEC") alleges as follows:

1. The SEC brings this action against George Slowinski for perpetrating an offering fraud scheme involving real estate in Chicago. Slowinski was a principal and owner of Rebuilding America, LLC ("Rebuilding America"), an issuer of securities which, between September 2013 and June 2014, raised more than $20 million from more than 600 investors.

2. Slowinski and Rebuilding America lured investors by promising to pay 38% returns in only two years. They told investors Rebuilding America would generate such generous returns through the profits of a successful real estate development program. Specifically, Slowinski and Rebuilding America told investors Rebuilding America would pool investor proceeds to acquire, refurbish, and sell for profit residential real estate primarily located on the South Side of Chicago.

3. While touting Rebuilding America's profitability, Slowinski hid from investors that between 34% and 42% of every invested dollar would be diverted, upfront, to Slowinski and his partners in the form of undisclosed fees and commissions. Slowinski also concealed that, as a result of the hidden fees, Rebuilding America would have significantly less funds to devote to its real

estate projects and would need to achieve unrealistic and outsized margins in an unreasonably short timeframe in order to pay investors the promised returns.

4.      To solicit investments, Slowinski presented himself as a real estate expert with a successful track record of building and refurbishing residential properties.  However, Slowinski quickly realized that Rebuilding America's business model was untenable, and that Rebuilding America would not be able to generate the margins or complete the volume of development projects needed to repay investors.  Nevertheless, Slowinski continued to solicit investors, accept the hidden fees, and use investor moneys to fund his real estate and construction businesses.

5.      Slowinski compounded his fraud by diverting more than $2.8 million of investor funds, which had been earmarked for construction on specific Rebuilding America projects, to improperly pay for his companies' payroll, overhead, and cost overruns on other projects.

6.      As a result of the hidden fees and Rebuilding America's inability to make even modest profits from its real estate projects, Rebuilding America could not pay investors the promised returns.  Instead, Rebuilding America simply paid investors one year's worth of interest payments.  But these first year payments were merely Ponzi-style returns which, unbeknownst to investors, came from investor principal as opposed to the profits from any real estate projects.

7.      By 2017, Rebuilding America had collapsed.  Its real estate projects had failed, the State of Illinois revoked Rebuilding America's corporate status, and investors received less than half the promised interest payments and none of their principal investment.  In total, the investors lost more than $17 million.

8.      This lawsuit seeks to hold Slowinski responsible for his role in the Rebuilding America fraud.

## JURISDICTION AND VENUE

9.      The SEC brings this action under Securities Act of 1933 ("Securities Act")

Section 20(b) [15 U.S.C. §77t(b)] and Securities Exchange Act of 1934 ("Exchange Act")

Sections 21(d) and (e) [15 U.S.C. §§78u(d) and 78u(e)].

10.     This Court has jurisdiction over this action pursuant to Section 22 of the

Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

11.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15

U.S.C. § 78aa].  Many of the acts, practices, and courses of business constituting the violations

alleged herein occurred within the Northern District of Illinois.

12.     During the period at issue in this Complaint, Slowinski resided in this District and

ran his businesses, including the issuer of the securities described herein, from offices in

Frankfort, Illinois.

13.     The securities described herein involved real estate investments in Chicago.

Namely, Slowinski and his businesses used investor funds to purchase, renovate, and develop

Chicago residential properties.  Rebuilding America incurred irrevocable liability in the United

States to deliver its securities to investors.

14.     Slowinski directly and indirectly made use of the means and instrumentalities of

interstate commerce and of the mails in connection with the acts, practices, and courses of

business alleged herein, and will continue to do so unless enjoined.

## DEFENDANT

15.     **George Slowinski**, age 67, is currently a resident of Texas.  During the period at

issue in the Complaint, Slowinski resided in Homer Glen, Illinois.  Slowinski owned and controlled

a limited liability company which had a one-third membership interest in Rebuilding America. He also was Rebuilding America's registered agent.

16.     Slowinski additionally owned and controlled G-Slow Real Estate Team, LLC ("G-Slow Real Estate") and G-Slow Construction Services, LLC ("G-Slow Construction"), which were, respectively, real estate and property development companies based in Frankfort, Illinois. Through these companies, Slowinski provided real estate and construction services for Rebuilding America. He also assisted Rebuilding America in raising funds from investors.

## OTHER RELEVANT ENTITIES

17.     **Rebuilding America, LLC** was an Illinois limited liability company and the issuer of the securities described herein. Rebuilding America's principal place of business was in Frankfort, Illinois. Slowinski was a principal and, though a company he owned and controlled, a one-third owner of Rebuilding America. In 2017, the State of Illinois involuntarily dissolved Rebuilding America's corporate status.

18.     **Project Kudos Group Limited** ("Project Kudos") was a company based in London, United Kingdom. Project Kudos and its principals assisted in creating Rebuilding America and marketing Rebuilding America securities to investors.

19.     **Infinity Treasures Private Limited** ("Infinity Treasures") was a marketing firm located in Singapore. Infinity Treasures and its principals assisted in creating Rebuilding America and marketing Rebuilding America securities to investors.

## FACTS

20.     Rebuilding America was a real estate investment program marketed primarily in Singapore and Malaysia. Rebuilding America generally represented to investors that it would

earn money by pooling investor proceeds to acquire, refurbish, and sell real estate located on the South Side of Chicago.

**Slowinski's Key Role with Rebuilding America**

21.     By summer 2013, after several meetings in the Chicago area, Project Kudos, Infinity Treasures, Slowinski, and his U.S.-based partners had agreed to offer Rebuilding America securities to investors. By that time, these parties, who are herein referred to as Rebuilding America's "principals," also agreed regarding their respective roles in the Rebuilding America program, their compensation, and the terms of the securities offered to investors.

22.     Slowinski agreed to serve as Rebuilding America's registered agent. He also agreed to run Rebuilding America's day-to-day operations through his Chicago-area real estate and construction companies.

23.     Slowinski agreed that his real estate company, G-Slow Real Estate, would identify, acquire, and sell the properties purchased with funds raised from Rebuilding America investors. Slowinski also agreed that his construction company, G-Slow Construction, would act as Rebuilding America's general contractor for construction and refurbishment of the acquired real estate.

24.     To entice investors, Slowinski and Rebuilding America's other principals agreed that Rebuilding America would promise 38% returns plus return of capital over only two years.

25.     Slowinski and Rebuilding America's other principals also agreed to handsomely compensate themselves for their efforts. Namely, they agreed to collectively receive between 34% and 42% of the money invested in Rebuilding America. Per their agreement, Slowinski himself would receive between 2.3% and 3% of every dollar invested in Rebuilding America.

26.     Slowinski and Rebuilding America's other principals also agreed to keep their compensation secret, in the form of undisclosed fees and commissions charged to the unwitting

investors. Thus, the investors were unaware that, instead of all their money being deployed to purchase, build, or renovate real estate, more than 34% of investor proceeds went directly to Slowinski and Rebuilding America's other principals.

27. The investors were similarly unaware that to meet the 38% returns while siphoning at least 34% off each investment, Rebuilding America's real estate development program would need to generate unrealistically massive profits in an unreasonably short timeframe.

28. Slowinski reviewed draft versions of the investment contracts entered into between Rebuilding America and its investors, referred to as "Cycle Agreements," which detailed the terms of the investment, and was asked by Rebuilding America's other principals to approve proposed changes.

29. Slowinski also provided information used in marketing materials and presentations made to investors, and also approved edits to Rebuilding America marketing brochures.

**Slowinski and Rebuilding America Solicit Investors with Promises of a Profitable Real Estate Development Program and 38% Returns in Only Two Years**

30. In an effort to solicit investor money, Rebuilding America and its principals gave live presentations promoting the investment to large groups of investors in Singapore and Malaysia.

31. At the presentations, Rebuilding America's principals described the nature of the investment, including how Rebuilding America would pool investors' proceeds to acquire and develop real estate in Chicago. Rebuilding America's principals also detailed how investors would receive, in only two years, 38% returns – 18% after year one and 20% after year two – plus 100% of their investment principal.

32. Slowinski participated in and presented at one such presentation on September 21, 2013, in Singapore, and at multiple presentations in early February 2014, in Singapore and Malaysia.

33.     At the presentations, Slowinski spoke favorably about his background, his real estate and construction companies, and his experience in the Chicago real estate market.  He described his companies as experts at flipping properties, provided examples of particularly profitable transactions, and touted the profits Rebuilding America would generate flipping properties on behalf of investors.

34.     At the presentations, Rebuilding America's principals showed investors a PowerPoint slideshow trumpeting the benefits of investing in Chicago residential real estate and referring to Rebuilding America as the "ultimate armchair investment."  The PowerPoint described Slowinski's real estate and construction companies as "Experts in Chicago real estate and development" who had "developed a proven system for buying foreclosure properties quickly at below market prices, rehabilitate, and selling it for a profit!"  The PowerPoint also promoted Slowinski's "[w]ell defined and proven methodical system" of real estate development and Rebuilding America's "proprietary program system" for selecting properties.

35.     The PowerPoint contained a diagram – titled "The 'Rebuilding America' Cycle" – showing Rebuilding America and Slowinski's companies using investor proceeds to purchase, refurbish, and sell real estate and investors receiving "38% fixed" returns within 24 months.  Later in the PowerPoint, Rebuilding America represented:  "Investors' returns are paid from the profits generated by selling our rehabbed homes."

36.     At the presentations, investors also received brochures describing Rebuilding America as "an investment opportunity formed by leading real estate experts to buy, refurbish and sell properties in key growth areas of Chicago."  The brochures outline how investor money will be pooled to purchase and develop real estate, and describe Slowinski's real estate and construction companies as "experts in Chicago real estate."  The brochures further represent that Slowinski's

companies have "developed a proven system for buying foreclosure property quickly and below market prices."

37.     The brochures again tout the returns of the investment:  18% interest after year one, plus an additional 20% interest and 100% return of capital after year two.

38.     At no time did Slowinski, or anyone else, disclose to investors that:  (a) investor money would be spent on uses other than real estate; (b) Rebuilding America's principals would receive at least 34% of investor proceeds before any money would be deployed to acquire or develop real estate; or (c) as a result of the hidden fees and commissions, Rebuilding America would need to generate unrealistically massive profits from developing real estate in order to repay investors.

39.     The investors typically invested at or shortly after attending the seminars.  Investors either wired money to a currency exchange agent in the United Kingdom or provided money to Infinity Treasures to wire to the currency exchange agent.  From there, Rebuilding America directed that investor funds, minus the 34%-42% upfront fees paid to Slowinski and Rebuilding America's principals, be sent from the currency exchange agent to a United States escrow agent controlled by Rebuilding America.  Rebuilding America accepted these escrowed funds and used them to purchase and develop real estate in Chicago.  Slowinski was aware of and did not object to this process.

40.     As part of their investments, the investors also signed the Cycle Agreements. Typically, an investor signed a Cycle Agreement and returned it to Rebuilding America after Rebuilding America had received the investor's funds, diverted the undisclosed fees to Slowinski and his partners, and began deploying remaining money to purchase or develop real estate.  The Cycle Agreements provided that the two-year investment term would commence shortly after the

investors were required to send their investment money to the U.S., which was typically well before investors ever received or signed the Cycle Agreements.

41.     The Cycle Agreements represent that Rebuilding America will use investor proceeds to "purchase…various residential properties located in the United States for the purpose of refurbishing same and resale…"

42.     The Cycle Agreements further represent that all of the money provided by investors would initially be held in escrow, and that investor money would be released from escrow "only for the purposes of purchasing or refurbishing" real estate.  The Cycle Agreements also represent that each investor "shall have a beneficial interest, equal to the [investment] amount herein stated, in any and all properties purchased" with the investor's money.

43.     The Cycle Agreements also represent that investors would be paid, after year one, 18% returns and, after year two, another 20% plus the return of their initial investment.  The Cycle Agreements also state that Rebuilding America's obligations to repay investors "are not dependent in any way on the success, progress or profitability of the refurbishment of any particular property purchased by [Rebuilding America]."

44.     The Cycle Agreements additionally provide that the investor and Rebuilding America "agree that the site of this contract is the State of Illinois."

45.     By April 2014, Rebuilding America had raised more than $20.7 million from investors in Asia.  After raising those funds, Rebuilding America stopped raising funds in Asia due to concerns, including concerns shared by Slowinski, about its ability to generate sufficient profits to repay investors.

46.     Despite those concerns, by April 2014 Slowinski and Rebuilding America agreed to target investors in Australia, and ultimately raised $194,000 from three Australian investors.

47.     As with the Asian investors, Rebuilding America told the Australian investors it would use their money to develop real estate in Chicago and would pay 38% returns over two years.

48.      Similar to what Slowinski and his partners had done with the Asian investors, Rebuilding America concealed from the Australian investors that at least 30% of their investment proceeds would be immediately diverted to pay Slowinski and his partners.  Rebuilding America also hid that Slowinski and his partners' concerns about Rebuilding America's profitability had resulted in them ceasing to offer securities to Asian investors.

49.     Using investor money as opposed to the profits of developing real estate, Rebuilding America eventually paid the Asian and Australian investors the promised 18% year-one interest payments.  But investors never received any additional payments – either the 20% interest promised for year two or their investment principal.  As discussed below, Rebuilding America could not make these payments because of the heavy undisclosed fees diverted to Slowinski and his partners, and because Rebuilding America failed to make the profitable real estate investments it promised to investors.

**Slowinski and Rebuilding America Defrauded Their Investors**

50.     As described below, Slowinski and Rebuilding America defrauded investors in a variety of ways.

**A.      Slowinski and Rebuilding America Concealed Enormous Upfront Fees that Doomed the Investment from the Start**

51.     Slowinski and Rebuilding America first defrauded investors by representing that Rebuilding America would spend investor money acquiring and developing real estate, while concealing that Rebuilding America diverted between 34% and 42% of investor proceeds, in the form of undisclosed upfront fees and commissions, to Slowinski and his partners.

52.     Rebuilding America – through the oral presentations, brochures, PowerPoint slideshows, and Cycle Agreements described above – repeatedly represented to investors that Rebuilding America would use their money, and would generate profits, by buying, refurbishing, and selling real estate.  But Rebuilding America never disclosed that before any investor money was spent on real estate, at least 34% of investor proceeds would be diverted to pay undisclosed fees and commissions to Rebuilding America's principals.

53.     At the Singapore and Malaysia presentations, Slowinski directly represented to investors how he would use investor proceeds to identify, buy, refurbish and sell properties in Chicago.  At these seminars, Slowinski told investors how much profit Rebuilding America expected to generate off each redeveloped property and how many "flips" Rebuilding America could perform each year.  Slowinski never told investors that large portions of their investment would be used to pay him and Rebuilding America's other principals.

54.     Slowinski's and Rebuilding America's representations to investors were false, misleading, and omitted material information, because they failed to disclose that, rather than being spent on real estate, 34% to 42% of the funds raised went to upfront fees and commissions paid to Rebuilding America's principals.

55.     Specifically, while Rebuilding America raised more than $20.7 million from the Asian investors, Rebuilding America's principals made less than $12.7 million available to invest in real estate.  Rebuilding America's principals, including Slowinski, siphoned off the remaining $8 million for themselves.

56.     In addition to concealing that Rebuilding America would divert more than one-third of every dollar invested to line the pockets of its principals, Slowinski and Rebuilding America

failed to disclose that these upfront payments effectively precluded Rebuilding America from making the promised returns to investors.

57.     This upfront diversion of investor money meant that no more than 66% of investors' proceeds were available to produce the 38% returns Rebuilding America promised to investors, along with repaying their entire capital investment, in just two years.  Yet Slowinski and Rebuilding America never disclosed that they would need to generate unrealistically massive profits in an unreasonably short timeframe to pay investors the promised returns.

58.     Slowinski knew that Rebuilding America never told investors about the upfront diversion of investor money to its principals.  He attended at least three large presentations in Asia in September 2013 and February 2014, where he and other principals of Rebuilding America discussed the use of investor funds but never disclosed the upfront payments.

59.     Slowinski also reviewed the Cycle Agreements which falsely represented that investor proceeds would only be used for acquiring and developing real estate.

60.     By virtue of the undisclosed payments to Rebuilding America's principals, the Cycle Agreements' representations, that investors would have a "beneficial interest" in the purchased real estate equal to the investor's investment amount, were likewise misleading.  In reality, any "beneficial interest" the investors had in real estate purchased with their money was diluted by at least the 34% of their investment that was diverted to Rebuilding America's principals.

61.     Slowinski also reviewed Rebuilding America marketing materials which touted Rebuilding America's real estate development program but did not disclose the upfront fees and commissions paid to its principals.

62.     Slowinski's failure to disclose the large upfront payments was even more egregious given that he was warned that investors received no such disclosures.  Specifically, by December

2013, the external accountants for Rebuilding America and Slowinski's real estate and construction businesses had brought to Slowinski's attention that investors received no disclosure that (a) investor proceeds were being diverted to Rebuilding America's principals or (b) the full amount of their investment was not being spent on real estate. The accountants also warned Slowinski that, as a result of the upfront fees, Rebuilding America would have difficulty repaying investors unless it achieved unrealistic profit margins on an unrealistic amount of completed projects.

63. In March 2014, Rebuilding America's accountants again raised with Slowinski their concerns that investors were not told that large portions of their investments would not be spent on real estate.

64. Despite these warnings, Slowinski and Rebuilding America continued to solicit investors while never advising them about the upfront fees and commissions, or the impact this diversion of funds would have on Rebuilding America's ability to repay investors.

### B. Slowinski Diverted Additional Investor Funds to His Real Estate and Construction Companies

65. In addition to personally receiving at least 2.3% of every dollar invested in Rebuilding America, Slowinski also improperly diverted an additional $2.8 million in investor funds to his construction company, G-Slow Construction.

66. For the real estate that Rebuilding America actually developed, after diverting the undisclosed fees to its principals Rebuilding America would then use investor funds, held in escrow, to acquire the individual properties. From there, Slowinski would request that additional funds be released from escrow, in the form of a "construction draw," and paid to G-Slow Construction to perform construction or refurbishment work on the acquired property.

67.    Between October 2013 and January 2015, G-Slow Construction received approximately $7.1 million in construction draws from Rebuilding America.  The source of these funds was the investment proceeds of Rebuilding America's investors.

68.    Of the approximately $7.1 million G-Slow Construction received from Rebuilding America, Slowinski improperly diverted more than $2.8 million for uses other than those he represented when requesting the construction draws.

69.    Slowinski did so by requesting and obtaining construction draws to be used on specific Rebuilding America properties.  But instead of using the money to develop the intended properties, Slowinski simply pocketed the money for G-Slow Construction.

70.    For instance, on April 1, 2014, Slowinski learned that Rebuilding America would stop seeking investments from Asian investors, and that no new investor funds would be forthcoming.  Over the next month, Slowinski requested and G-Slow Construction received more than $2 million of escrowed investor funds to perform new construction on vacant lots previously acquired by Rebuilding America.

71.    However, G-Slow Construction never performed any work on the vacant lots, which Rebuilding America eventually resold at close to their acquisition price.

72.    Instead of doing work on the earmarked lots, Slowinski directed G-Slow Construction to use the $2 million on unrelated expenditures, such as to pay for cost overruns on other projects, and to pay for G-Slow Construction's and G-Slow Real Estate's payroll, overhead, and general business expenses.

73.    Slowinski knew that diverting investor money to G-Slow Construction was improper.  He knew that when he requested money from Rebuilding America, G-Slow Construction was supposed to use those funds on the intended properties specified in Slowinski's request.  He also

14

knew that Rebuilding America represented to investors that their money would be used to acquire and develop real estate, as opposed to being an investment in G-Slow Construction.

74.     In September 2014, G-Slow Construction acknowledged in a progress report to Project Kudos that it owed more than $2 million associated with diverted construction funds intended for various Rebuilding America properties.

75.     In August 2015, Rebuilding America's new external accountant confronted Slowinski about the construction draws not being used for construction on the intended vacant lots. Slowinski responded by firing the accountant the following day.

76.     By the time of Rebuilding America's demise, G-Slow Construction had spent more than $2.8 million of Rebuilding America investor money on uses – such as payroll and general business expenditures – other than developing the intended real estate for Rebuilding America. Slowinski never returned this money to Rebuilding America or its investors.

**C.      Slowinski Accepted Investor Funds and Continued to Participate in the Scheme Despite Believing Rebuilding America Could Not Repay Investors**

77.     Slowinski agreed to the terms of the Rebuilding America investment – including the upfront payout to Rebuilding America's principals and the 38% interest to investors – despite having concerns Rebuilding America would be unable to generate the promised returns.

78.     For instance, Slowinski believed that the two-year timeframe for the 38% returns was untenable for the construction and "full-gut" rehab projects Rebuilding America depicted to investors.  Instead, Slowinski believed that the two-year return window, coupled with the significant upfront fees paid to Rebuilding America's principals, would only allow Rebuilding America to perform cheaper and more cosmetic "lipstick" rehab projects.

79.     However, when Slowinski's partners rejected his lipstick rehab proposal, Slowinski agreed to pursue more expensive and time-consuming new construction and full-gut rehab projects.

Slowinski also requested and accepted millions of investor dollars for G-Slow Construction to perform work on these longer-term projects which Slowinski believed would not result in the promised returns for investors.

80. Even though Rebuilding America described Slowinski as a real estate "expert," he lacked experience flipping or developing the high number of properties in the short timeframes required by the Rebuilding America model. In fact, Slowinski had less than one year of experience in buying and rehabbing single family homes, the very real estate projects presented to investors.

81. Slowinski also had no experience dealing with permitting procedures imposed by the City of Chicago in mid-2013, which significantly extended the time it took G-Slow Construction to obtain necessary construction permits. Slowinski did not initially know the full magnitude of the delays and cost increases that would result, or whether the permitting requirements would even allow Rebuilding America to meet its projected timeline for completing projects.

82. Slowinski's lack of experience and associated concerns quickly materialized as Rebuilding America immediately experienced construction delays and cost overruns.

83. By December 2013, Rebuilding America's accountants warned Slowinski that Rebuilding America's initial assumptions – including profit margin and the timeframe for flipping a property – were unrealistic. Also in December 2013, Slowinski learned that a similar investment program run by Project Kudos and Infinity Treasures had defaulted on its promised payments to investors, including investors who later invested in Rebuilding America.

84. Despite his concerns, and without sharing them with investors, Slowinski accepted investor money for G-Slow Construction projects and assisted Rebuilding America raise money by participating at the investor presentations in Singapore and Malaysia.

16

85.     In March 2014, Rebuilding America's accountants again raised concerns regarding the viability of Rebuilding America.  The accountants warned Slowinski that Rebuilding America could be unable to repay investors with the low profit margins generated to date, and questioned whether Rebuilding America should continue to accept investor funds.  Around this time, Rebuilding America's internal accountant voiced similar concerns that the company's profit and project volume projections were unrealistic.

86.     Nevertheless, and without disclosure of these concerns to investors, Slowinski continued to accept investor funds for his companies and agreed to have Rebuilding America solicit Australian investors.

### D.     Slowinski and Rebuilding America Misappropriated the Australian Investors' Investments and Made Ponzi-style Payments to Investors

87.     Even after Rebuilding America had failed to the point it would no longer accept investments from the Asian investors, Slowinski nevertheless agreed that Rebuilding America would solicit investments from Australian investors.

88.     In April and May 2014, Rebuilding America cumulatively raised approximately $194,000 from three Australian investors.  Rebuilding America told the Australian investors it would use their money to develop profitable real estate in Chicago and pay 38% returns over two years.

89.     However, after securing the Australian investments, Slowinski and Rebuilding America chose not to purchase any real estate with the Australian investors' money.  Instead, in November 2014 Rebuilding America transferred $135,000 – representing the Australian investors' proceeds minus the hidden upfront fees paid to Slowinski and his partners – from a separate escrow account to a commingled account that held the remaining investment proceeds of the Asian investors.

17

90.     With Slowinski's knowledge and approval, Rebuilding America then used the money in the commingled account, including the Australian investors' money, to make Ponzi-style payments of the first year 18% interest to the Asian and Australian investors.

91.     Rebuilding America included with the payments letters to investors signed by Slowinski.  In one such letter, Slowinski acknowledged that some investors were "getting anxious" because they had not received their interest payments when expected.  Rather than disclose that the delay in payments resulted from Rebuilding America's systematic failures described above, Slowinski downplayed the cause of the delays as being mere closing date postponements for the sale of two properties.

92.     Slowinski approved the investor payments even though Rebuilding America was running a large deficit.

93.     Unbeknownst to the investors, the money used to make the first year interest payments did not come from the profits of real estate development projects.  Rather, the money came from Ponzi-style payments consisting of un-invested investor principal or the proceeds from the unprofitable sale of real estate, which simply amounted to investors' own principal.

94.     By September 2014, even though Rebuilding America had acquired more than 45 properties with investor money, it had only sold three properties, each for a loss exceeding $23,000.

95.     From October 2014 through April 2015 – the same time period Rebuilding America was making first year interest payments to investors who invested between October 2013 and March 2014 – Rebuilding America sold 21 homes for combined losses of approximately $4.1 million.

96.     After April 2015, Rebuilding America would continue selling the properties it had acquired with investor funds, again sustaining significant losses.  However, Rebuilding America did

not use the proceeds of these sales to repay investors, who received no additional payments – interest or principal – other than their first year 18% interest.

97.     By 2017, Rebuilding America had effectively stopped all real estate development activities, thereby dooming the prospects of any additional recovery for the victimized investors.

98.     In all, investors lost more than $17 million.

## COUNT I

**Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5**

99.     Paragraphs 1 through 98 are realleged and incorporated by reference.

100.    As more fully described in paragraphs 1 through 98, Slowinski, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly:  used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

101.    As described in more detail in paragraphs 1 through 98 above, Slowinski acted with scienter in that he knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent scheme identified above.

102.    By reason of the foregoing, Slowinski violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT II

**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

103.    Paragraphs 1 through 98 are realleged and incorporated by reference.

104.    As more fully described in paragraphs 1 through 98, Rebuilding America, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

105.    Rebuilding America acted with scienter and/or recklessly.

106.    Slowinski knowingly or recklessly provided substantial assistance to Rebuilding America in the commission of these violations.

107.    By reason of the foregoing, Rebuilding America violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Slowinski is liable for aiding and abetting those violations pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## **COUNT III**

### **Violations of Section 17(a) of the Securities Act**

108.    Paragraphs 1 through 98 are realleged and incorporated by reference as though fully set forth herein.

109.    By engaging in the conduct described in paragraphs 1 through 98 above, Slowinski, in the offer and sale of securities, by the use of the means and instruments of interstate commerce, directly or indirectly:

a.    employed devices, schemes and artifices to defraud;

    b.   obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.   engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

110.    Slowinski intentionally, recklessly, and negligently engaged in the conduct described above.

111.    By reason of the foregoing, Slowinski violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT IV

### Aiding and Abetting Violations of Section 17(a) of the Securities Act

112.    Paragraphs 1 through 98 are realleged and incorporated by reference as though fully set forth herein.

113.    By engaging in the conduct described in paragraphs 1 through 98 above, Rebuilding America, in the offer and sale of securities, by the use of the means and instruments of interstate commerce, directly or indirectly:

    a.   employed devices, schemes and artifices to defraud;

    b.   obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.   engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

114.    Rebuilding America intentionally, recklessly, and negligently engaged in the conduct described above.

115.    Slowinski knowingly or recklessly provided substantial assistance to Rebuilding America in the commission of these violations.

116.    By reason of the foregoing, Rebuilding America violated Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)], and Slowinski is liable for aiding and abetting those

violations pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

## RELIEF REQUESTED

**WHEREFORE,** the SEC respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Slowinski committed the violations

charged and alleged herein.

### II.

Enter an Order of Permanent Injunction restraining and enjoining Slowinski, his officers,

agents, servants, employees, attorneys and those persons in active concert or participation with

Slowinski who receive actual notice of the Order, by personal service or otherwise, and each of

them from, directly or indirectly, engaging in the transactions, acts, practices or courses of

business described above, or in conduct of similar purport and object, in violation of Section

17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15

U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder.

### III.

Issue an Order requiring Slowinski to disgorge the ill-gotten gains received as a result of

the violations alleged in this Complaint, including prejudgment interest.

### IV.

With regard to the Slowinski's violative acts, practices and courses of business set forth

herein, issue an Order imposing upon Slowinski appropriate civil penalties pursuant to Section

20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15

U.S.C. § 78u(d)(3)].

## V.

Retain jurisdiction of this action in accordance with principles of equity and the Federal

Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees

that may be entered or to entertain any suitable application or motion for additional relief within

the jurisdiction of this Court.

## VI.

Grant such other relief as this Court deems appropriate.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby requests a

trial by jury.


                                             Respectfully Submitted,

Dated: May 29, 2019                           /s/ Benjamin J. Hanauer
                                             Benjamin J. Hanauer (hanauerb@sec.gov)
                                             Timothy J. Stockwell (stockwellt@sec.gov)
                                             175 West Jackson Blvd., Suite 1450
                                             Chicago, IL 60604
                                             Phone:  (312) 353-7390
                                             Facsimile: (312) 353-7398
                                             Attorneys for Plaintiff
                                             U.S. Securities and Exchange Commission