UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ) ) ) ) Plaintiff, ) ) v. ) ) GEORGE SLOWINSKI, ) ) Defendant. ) ) | Civil Action No. 1:19-cv-03552 Honorable Edmond E. Chang |

**SEC'S MEMORANDUM IN SUPPORT OF ITS MOTION
FOR DISGORGEMENT, PREJUDGMENT INTEREST,
CIVIL PENALTIES, AND ENTRY OF FINAL JUDGMENT**

Defendant George Slowinski was a key player in a $20 million offering fraud scheme that

victimized more than 600 investors. To resolve this litigation, Slowinski entered into a

"bifurcated" settlement in which he consented to the Court enjoining him from again engaging in

securities fraud. (ECF No. 18-2, ¶ 2). The bifurcated settlement, which the Court approved,

additionally provides that the Court shall decide, via motion, the SEC's request for financial

remedies, and in doing so shall accept the allegations in the Complaint as true. (ECF No. 18-2,

¶ 3; ECF No. 23, § III).

For the reasons discussed below, based on the allegations in the Complaint and the

attached calculations of a SEC accountant, the Court should enter a Final Judgment against

Slowinski imposing disgorgement, prejudgment interest, and civil penalties.

**I. Procedural History**

The SEC filed its complaint on May 29, 2019. (ECF No. 1). The Complaint alleges that

Slowinski played a central role in an offering fraud scheme that raised at least $20 million from

1

more than 600 investors.  (*Id.*, ¶ 1).  Rather than engage in discovery, Slowinski entered a

bifurcated settlement which imposed, among other things, the permanent injunctive relief sought

by the SEC.  (ECF No. 18-2; ECF No. 23, §§ I, II).

Slowinski's bifurcated settlement additionally provides that the Court will resolve the

SEC's request for financial relief via the present motion.  Specifically, Slowinski agreed that "the

Court shall order disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil

penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3)

of the Exchange Act [15 U.S.C.§§ 78u(d)(3)]."  (ECF No. 18-2, ¶ 3).  Slowinski further agreed

"that the amounts of the disgorgement and civil penalty shall be determined by the Court upon

motion of the [SEC], and that prejudgment interest shall be calculated from February 13, 2014,

based on the rate of interest used by the Internal Revenue Service for the underpayment of

federal income tax as set forth in 26 U.S.C. § 6621(a)(2)."  (*Id.*)

Slowinski agreed to the following framework for resolving the SEC's request for

financial remedies:

> in connection with the [SEC]'s motion for disgorgement and/or civil penalties, and at any
> hearing held on such a motion [Slowinski] will be precluded from arguing that he did not
> violate the federal securities laws as alleged in the Complaint [and] solely for the
> purposes of such motion, the allegations of the Complaint shall be accepted as and
> deemed true by the Court.

(ECF No. 18-2, ¶ 3).

Given Slowinski's agreement, the only issues remaining for the Court to decide are the

amounts of disgorgement, prejudgment interest, and civil penalties to be imposed.  In making

this determination, the Court should accept as true the allegations in the Complaint, and should

additionally consider calculations contained in the attached declaration of SEC accountant Ann

Tushaus.

II.     **Facts Alleged in the Complaint, and Accepted as True for this Motion, Demonstrate that Slowinski Engaged in Securities Fraud**

The allegations from the Complaint, accepted as true per Slowinski's agreement, establish that Slowinski violated the antifraud provisions of the federal securities laws.

   **A.  Slowinski and Rebuilding America**

Rebuilding America, LLC ("Rebuilding America") was an Illinois company that issued the securities sold to investors in this case. (ECF No. 1, ¶ 17). Rebuilding America was a real estate investment program and generally represented to investors that it would earn money by pooling investor proceeds to acquire, refurbish, and sell real estate located on the South Side of Chicago. (*Id.*, ¶ 20).

Slowinski was a Rebuilding America principal, its registered agent and, through a company he owned and controlled, its one-third owner. (*Id.*, ¶¶ 17, 20). Slowinski ran Rebuilding America's operations through two real estate and construction companies he owned. (*Id.*, ¶ 22). Slowinski's real estate company, G-Slow Real Estate, identified, acquired, and sold the properties purchased with funds raised from Rebuilding America investors. (*Id.*, ¶ 23). Slowinski's construction company, G-Slow Construction, acted as Rebuilding America's general contractor for construction and refurbishment of the acquired real estate. (*Id.*).

To entice investors, Slowinski and Rebuilding America's other principals agreed that Rebuilding America would promise 38% returns plus return of capital over only two years. (*Id.*, ¶ 24). Slowinski and Rebuilding America's other principals handsomely compensated themselves for their efforts. Namely, they collectively received between 34% and 42% of the money invested in Rebuilding America. (*Id.*, ¶ 25). Slowinski personally received between 2.3% and 3% of every dollar invested in Rebuilding America. (*Id.*).

However, Slowinski and Rebuilding America kept these fees hidden from investors, who were never told that more than 34% of their investments would go to Slowinski and Rebuilding America's other principals. (*Id.*, ¶ 26). The investors were similarly unaware that to meet the 38% returns while siphoning at least 34% off each investment, Rebuilding America's real estate program would need to generate unrealistically massive profits in an unreasonably short timeframe. (*Id.*, ¶ 27).

**B. Slowinski and Rebuilding America's Solicitation of Investors**

To solicit investor money, Rebuilding America and its principals gave live promotional presentations to large groups of investors in Singapore and Malaysia. (*Id.*, ¶ 30). At the presentations, Rebuilding America's principals described the nature of the investment, including how Rebuilding America would pool investors' proceeds to acquire and develop real estate in Chicago. (*Id.*, ¶ 31). These presentations also detailed how investors would receive, in only two years, 38% returns plus 100% of their investment principal. (*Id.*).

Slowinski participated in and presented at one such presentation on September 21, 2013, in Singapore, and at multiple presentations in early February 2014, in Singapore and Malaysia. (*Id.*, ¶ 32). At the presentations, Slowinski spoke favorably about his background, his real estate and construction companies, and his experience in the Chicago real estate market. (*Id.*, ¶ 33). He described his companies as experts at flipping properties, provided examples of particularly profitable transactions, and touted the profits Rebuilding America would generate for investors. (*Id.*). At the presentations, investors received brochures touting Slowinski's companies and the 38% returns investors would receive in only two years. (*Id.*, ¶¶ 36-37).

As part of their investments, the investors signed contracts, called "Cycle Agreements," which represent that Rebuilding America will use investor proceeds to "purchase…various

residential properties located in the United States for the purpose of refurbishing same and resale…" (*Id.*, ¶¶ 40-41). The Cycle Agreements further represent that all of the money provided by investors would initially be held in escrow, and that investor money would be released from escrow "only for the purposes of purchasing or refurbishing" real estate. (*Id.*, ¶ 42). The Cycle Agreements also state that Rebuilding America's obligations to repay investors "are not dependent in any way on the success, progress or profitability of the refurbishment of any particular property purchased by [Rebuilding America]." (*Id.*, ¶ 43).

Despite the above representations, investors were never told that: (a) Rebuild America would spend investor money on uses other than real estate; (b) Rebuilding America's principals would receive at least 34% of investor proceeds before any money would be deployed to acquire or develop real estate; or (c) as a result of these hidden payments, Rebuilding America would need to generate unrealistically massive profits in order to repay investors. (*Id.*, ¶ 38).

By April 2014, Rebuilding America had raised more than $20.7 million from investors in Asia. (*Id.*, ¶ 45). After that, Rebuilding America stopped raising funds in Asia due to concerns, including concerns held by Slowinski, about its ability to generate sufficient profits to repay investors. (*Id.*). Nevertheless, by April 2014 Slowinski and Rebuilding America agreed to target investors in Australia, and ultimately raised $194,000 from three Australian investors. (*Id.*, ¶ 46).

As with the Asian investors, Rebuilding America told the Australian investors it would use their money to develop real estate in Chicago and pay 38% returns over two years. (*Id.*, ¶ 47). Similar to what Slowinski and his partners had done with the Asian investors, Rebuilding America concealed from the Australian investors that at least 30% of their investment proceeds would be immediately diverted to pay Slowinski and his partners. (*Id.*, ¶ 48). Rebuilding

America also hid that Slowinski and his partners' concerns about Rebuilding America's profitability had resulted in them ceasing to offer securities to Asian investors. (*Id.*).

### C. Slowinski and Rebuilding America Defrauded Their Investors

Slowinski and Rebuilding America defrauded investors in a variety of ways. First, they represented that Rebuilding America would spend investor money acquiring and developing real estate, while concealing that Rebuilding America diverted between 34% and 42% of investor proceeds, in the form of undisclosed upfront fees and commissions, to Slowinski and his partners. (*Id.*, ¶¶ 51-54).

Specifically, while Rebuilding America raised more than $20.7 million from the Asian investors, Rebuilding America made less than $12.7 million available to invest in real estate. (*Id.*, ¶ 55). Rebuilding America's principals, including Slowinski, siphoned off the remaining $8 million for themselves. (*Id.*). In addition to concealing that Rebuilding America would divert more than one-third of every dollar invested to line the pockets of its principals, Slowinski and Rebuilding America failed to disclose that these upfront payments effectively precluded Rebuilding America from making the promised returns to investors. (*Id.*, ¶¶ 56-57).

Slowinski's failure to disclose the large upfront payments was even more egregious given that he was warned that investors received no such disclosures. (*Id.*, ¶ 62). By December 2013, Rebuilding America's accountants had brought to Slowinski's attention that investors received no disclosure that (a) investor proceeds were being diverted to Rebuilding America's principals or (b) the full amount of their investment was not being spent on real estate. (*Id.*). The accountants also warned Slowinski that, as a result of the upfront fees, Rebuilding America would have difficulty repaying investors unless it achieved unrealistic profit margins on an unrealistic amount of completed projects. (*Id.*, ¶¶ 62, 83). The accountants provided Slowinski

6

similar warnings in March 2014, but Slowinski and Rebuilding America continued to solicit investors while not amending their disclosures. (*Id.*, ¶¶ 63-64, 85-86).

In addition to personally receiving at least 2.3% of every dollar invested in Rebuilding America, Slowinski also improperly diverted an additional $2.8 million in investor funds to his construction company, G-Slow Construction. (*Id.*, ¶ 65). Between October 2013 and January 2015, G-Slow Construction received approximately $7.1 million in construction draws from Rebuilding America, which were intended to fund construction or refurbishment work on property acquired with investor money. (*Id.*, ¶¶ 66-67).

From this $7.1 million, Slowinski improperly diverted more than $2.8 million for uses other than those he represented when requesting the construction draws. (*Id.*, ¶ 68). Slowinski did so by requesting and obtaining construction draws to be used on specific Rebuilding America properties. (*Id.*, ¶ 69). But instead of using the money to develop the intended properties, Slowinski used it on unrelated expenditures, such as to pay for cost overruns on other projects and for G-Slow Construction's and G-Slow Real Estate's payroll, overhead, and general business expenses. (*Id.*, ¶¶ 69-76). In August 2015, Rebuilding America's new external accountant confronted Slowinski about the draws not being used for construction on the intended properties. (*Id.*, ¶ 75). Slowinski fired the accountant the following day. (*Id.*)

Even after Rebuilding America had failed to the point it would no longer accept investments from the Asian investors, Slowinski nevertheless agreed that Rebuilding America would solicit investments from Australian investors. (*Id.*, ¶ 87). After securing the Australian investments, Slowinski and Rebuilding America chose not to purchase any real estate with the Australian investors' money. (*Id.*, ¶ 89). Instead, in November 2014 Rebuilding America transferred $135,000 – representing the Australian investors' proceeds minus the hidden upfront

fees paid to Slowinski and his partners – to a commingled account that held the remaining

investment proceeds of the Asian investors. (*Id.*). With Slowinski's knowledge and approval,

Rebuilding America then used the money in the commingled account, including the Australian

investors' money, to make Ponzi-style interest payments to the Asian and Australian investors.

(*Id.*, ¶ 90).

By September 2014, even though Rebuilding America had acquired more than 45

properties with investor money, it had only sold three properties, each for a loss exceeding

$23,000. (*Id.*, ¶ 94). From October 2014 through April 2015, Rebuilding America sold 21

homes for combined losses of approximately $4.1 million. (*Id.*, ¶ 95). After April 2015,

Rebuilding America would continue selling its properties, again sustaining significant losses.

(*Id.*, ¶ 96).

By 2017, Rebuilding America had effectively stopped all real estate development

activities. (*Id.*, ¶ 97). While investors initially received a single year of interest payments – in

the form of Ponzi-style distributions funded by investor proceeds instead of real estate

development profits – they received no additional payments and no return of their investment

principal. (*Id.*, ¶¶ 49, 96). In all, investors lost more than $17 million. (*Id.*, ¶ 98).

### D.    Slowinski's Securities Laws Violations

Slowinski violated the antifraud provisions of the federal securities laws. Specifically,

Slowinski violated, and aided and abetted violations of, Section 10(b) of the Securities Exchange

Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, which prohibit fraud in connection

with the purchase or sale of securities. (ECF No. 1, ¶¶ 99-107). For the same reasons, Slowinski

violated, and aided and abetted violations of, Section 17(a) of the Securities Act of 1933

("Securities Act"), which prohibits fraud in the offer or sale of securities. (*Id.*, ¶¶ 108-116).

### III.    Additional Facts Relating to Slowinski's Ill-Gotten Profits

SEC accountant Ann Tushaus reviewed various bank records to determine the amount of money Slowinski's companies received by virtue of the Rebuilding America offering fraud. (Ex. 1, Tushaus Dec., ¶¶ 4-5).  Ms. Tushaus calculated that between September 2013 and June 2014 Rebuilding America raised more than $20 million from investors.  (*Id.*, ¶ 7).  Ms. Tushaus further calculated that between December 14, 2013 and June 30, 2014, RealProp Chicago LLC, a company 100% owned by Slowinski, received $339,600 from Rebuilding America.  (*Id.*, ¶¶ 6, 8).[1]  She further determined that Slowinski used these investor funds for personal expenditures such as dining, travel, clothing, jewelry, tobacco, personal taxes, medical expenses, ATM withdrawals, and direct payments to Slowinski and his family members.  (*Id.*, ¶ 9).

### IV.    Argument:  The Court Should Order Disgorgement, Prejudgment Interest, and Civil Penalties

In determining the amount of financial remedies, the Court relies on a preponderance of the evidence standard.  *SEC v. Resources Planning Group, Inc.*, Case 12-cv-9509, ECF No. 51, p. 6 (N.D. Ill. Sept. 29, 2014) (Chang, J.) (citing *SEC v. Koenig*, 532 F. Supp. 2d 987, 993 (N.D. Ill. 2007)).  The Court may impose financial remedies based on direct or circumstantial evidence. *Koenig*, at 993.  For bifurcated settlements such as the one Slowinski entered, the Court may impose disgorgement and penalties without holding an evidentiary hearing.  *SEC v. Williky*, 2019 U.S. App. LEXIS 33526, *7-8 (7th Cir. Nov. 8, 2019) (affirming disgorgement and penalties imposed based on complaint's allegations, per terms of bifurcated settlement).

---

[1] Slowinski executed a tolling agreement, which tolled the five-year statute of limitations as of December 14, 2018.  A copy of that tolling agreement is attached hereto as Exhibit 2.

9

### A.      Slowinski Should Pay Disgorgement and Prejudgment Interest

"Disgorgement is an equitable remedy designed to deprive a wrongdoer of unjust enrichment and also to deter others." *SEC v. Black*, 2009 U.S. Dist. LEXIS 37309, *6 (N.D. Ill. Apr. 30, 2009); *see also SEC v. Lipson*, 278 F.3d 656, 662-63 (7th Cir. 2002). "The authority of a federal court to order disgorgement in an SEC enforcement action is well-established." *SEC v. Zenergy Int'l, Inc.*, 2016 U.S. Dist. LEXIS 127630, *11 (N.D. Ill. Sept. 20, 2016) (imposing disgorgement via "bifurcated" settlement); *see also SEC v. Randy*, 38 F. Supp. 2d 657, 673-74 (N.D. Ill. 1999).

To obtain disgorgement, the SEC need only demonstrate that its figure is "a reasonable approximation of profits causally connected to the violation." *SEC v. Michel*, 521 F. Supp. 2d 795, 830-31 (N.D. Ill. 2007); *see also Resources Planning*, ECF No. 51, p. 6; *Black,* 2009 U.S. Dist. LEXIS 37309, at *7. Thus, the disgorgement calculation "need not be exact." *Koenig*, 532 F. Supp. 2d at 994. Once the SEC demonstrates an appropriate disgorgement calculation, the burden then shifts to the defendant to show that the approximation is inaccurate. *Resources Planning*, p. 6; *Black* at *7; *Randy* at 674. Moreover, any "ambiguity in the calculation should be resolved against the defrauding party." *Black* at *7, *see also Koenig* at 994; *Randy* at 674; *Zenergy*, 2016 U.S. Dist. LEXIS 127630, at *11.[2]

The proper measure of disgorgement is the defendant's personal gains from the fraudulent securities offering. *Randy,* 38 F. Supp. 2d at 674; *Zenergy*, 2016 U.S. Dist. LEXIS 127630, at *11-13; *SEC v. Equitybuild, Inc.*, Case 18-cv-5587, ECF No. 553, p. 3 (N.D. Ill.

---

[2] A defendant's current financial situation, or any hardship that disgorgement would impose, are not factors to be considered in determining disgorgement. *See, e.g., SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008); *SEC v. Mohn*, 2005 U.S. Dist. LEXIS 19572, *15 (E.D. Mich. Sept. 9, 2005); *SEC v. Robinson*, 2002 U.S. Dist. LEXIS 12811, *27-28 (S.D.N.Y. July 16, 2002).

Sept. 24, 2019). As in these decisions, Slowinski should be required to disgorge the amount

of money he received from Rebuilding America while perpetrating the offering fraud alleged

in the Complaint, within the five-year statute of limitations. That figure is $339,600, the

amount of money Slowinski's company received from Rebuilding America, which allowed

Slowinski to pay for personal expenditures such as dining, travel, clothing, jewelry, tobacco,

personal taxes, medical expenses, ATM withdrawals, and direct payments to Slowinski and

his family members. (Ex. 1, Tushaus Decl., ¶¶ 8-9).

"In an SEC enforcement action, a disgorgement order should include all gains flowing

from the illegal conduct, including prejudgment interest, to ensure that the wrongdoer does not

make any illicit profits." *Michel*, 521 F. Supp. 2d at 831; *see also Randy*, 38 F. Supp. 2d at 674;

*Lipson*, 278 F.3d at 663; *SEC v. Alanar, Inc.*, 2008 U.S. Dist. LEXIS 37241, *18 (S.D. Ind. May

6, 2008) ("An award of prejudgment interest ensures that [defendants] do not 'benefit from what

amounts to an interest-free loan obtained as a result of illegal activity.'" (citations omitted)). The

proper method for calculating prejudgment interest on a disgorgement award, and the one to

which Slowinski agreed, is the IRS underpayment rate. *Zenergy*, 2016 U.S. Dist. LEXIS

127630, at *13; *Resources Planning*, ECF No. 51, p. 13. Using this methodology, the

prejudgment interest on Slowinski's disgorgement is $84,107. (Ex. 1, Tushaus Decl., ¶ 10).

### B. Slowinski Should Pay Civil Penalties

The Court should also impose civil penalties against Slowinski, pursuant to Section 20(d)

of the Securities Act and Section 21(d) of the Exchange Act. 15 U.S.C. §§ 77t(d), 78u(d).

Congress authorized such penalties to achieve the dual goals of punishing the violator and

deterring future violations. *SEC v. Jakubowski*, 1997 U.S. Dist. LEXIS 14575, *8-9 (N.D. Ill.

Sept. 19, 1997), *aff'd* 150 F.3d 675 (7th Cir. 1998). In securities fraud cases like this one, courts

"routinely" award substantial penalties. *SEC v. Cook*, 2015 U.S. Dist. LEXIS 111513, at *87 (S.D. Ind. Aug. 24, 2015) (citations omitted).

The Securities Act and Exchange Act identically set out three tiers for determining the amount of penalties that may be imposed for "each violation" of the securities laws. The applicable penalty amounts are periodically adjusted for inflation. *See,* 17 C.F.R. § 201.1005 and 17 C.F.R. Part 201 Table I to Subpart E. "The third (and highest) tier is reserved for conduct that (1) involves fraud, deceit, or manipulation, and (2) resulted in substantial losses (or created a risk of such losses) to others." *Zenergy*, 2016 U.S. Dist. LEXIS 127630, *16 (citing 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii)). For the period at issue, the maximum third tier penalty for individuals is the higher of (1) $150,000 per violation; or (2) the gross amount of pecuniary gain to such defendant as a result of the violation. *See,* 17 C.F.R. § 201.1005 and 17 C.F.R. Part 201 Table I to Subpart E; *Zenergy* at *16.

Applying the first statutory basis, courts have assessed penalties "per violation," such that each separate instance of misconduct factors in the computation of the dollar amount of the penalty. *See, e.g., Resources Planning*, ECF No. 51, p. 17 (imposing a third-tier penalty for each defrauded investor, and dividing the total in half to account for mitigating factors); *SEC v. Durham*, 2017 U.S. Dist. LEXIS 131985, *21-23 (S.D. Ind. Aug. 18, 2017) (ordering third-tier penalties for each criminal count sustained on appeal); *SEC v. Lazare Indus.*, 294 Fed. Appx. 711, 715 (3d Cir. 2008) (affirming penalty that was five times the statutory maximum amount for "*each* violation," and noting that district court could have imposed a separate maximum amount for each of defendant's 54 fraudulent stock sales) (emphasis in original); *SEC v. Colonial Inv. Mgmt. LLC*, 659 F. Supp. 2d 467, 503 (S.D.N.Y. 2009) (court found 18 violations of the same regulation and imposed penalty of 18 times the statutory penalty amount); *SEC v. Coates*, 137 F.

12

Supp. 2d 413, 430 (S.D.N.Y. 2001) (court calculated penalty by multiplying number of misrepresentations by statutory penalty amount); *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 17 n.15 (D.D.C. 1998) (court assessed third-tier penalty of $1.2 million by multiplying maximum statutory penalty amount ($100,000 at the time) by number of defrauded investors (twelve)).

Relying on the second statutory metric for assessing penalties, other courts have imposed penalties "in amounts equal to the gross pecuniary gain of the defendant(s)." *See, e.g., Zenergy*, 2016 U.S. Dist. LEXIS 127630, *17-20 (citations omitted); *SEC v. Equitybuild*, Case 18-cv-5587, ECF No. 553, p. 3 (N.D. Ill. Sept. 24, 2019); *Cook*, 2015 U.S. Dist. LEXIS 111513, *86-87 ("With regard to gross pecuniary gain, 'many courts have imposed a single penalty equal to the amount of disgorgement.'" (citations omitted)).

As in the above decisions, Slowinski's securities laws violations warrant the imposition of maximum third-tier penalties. Taken as true for the purposes of this motion, the allegations in the Complaint demonstrate that Slowinski violated the antifraud provisions of the Securities Act and Exchange Act, including provisions that require a finding of scienter. And Slowinski's conduct resulted in substantial losses, as the defrauded investors lost in excess of $17 million. (ECF No. 1, ¶ 98).

Accordingly, the Court should impose maximum third tier civil penalties. *See, e.g., Lipson*, 278 F.3d at 664 (affirming imposition of maximum civil penalty); *SEC v. DeMaria*, 2013 U.S. Dist. LEXIS 119779, *4-5 (N.D. Ill. Aug. 22, 2013) (imposing third tier penalties); *SEC v. Equitybuild*, Case 18-cv-5587, ECF No. 553, p. 3 (N.D. Ill. Sept. 24, 2019) (same); *Randy*, 38 F. Supp. 2d at 674-75 (same); *Zenergy*, 2016 U.S. Dist. LEXIS 127630, *17-20 (same); *Jakubowski*, 1997 U.S. Dist. LEXIS 14575, *8-9 (same). Ultimately, any penalty awarded should uphold the aims of the federal securities laws and act as a strong deterrent to those who

seek to violate them.

## V.  CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court issue a final

judgment as to Slowinski imposing disgorgement plus prejudgment interest, and maximum third-

tier civil penalties.

Dated:   November 14, 2019                     Respectfully submitted,

                                                   /s/ Benjamin Hanauer
                                               Benjamin J. Hanauer (hanauerb@sec.gov)
                                               Timothy J. Stockwell (stockwellt@sec.gov)
                                               175 West Jackson Blvd., Suite 1450
                                               Chicago, IL 60604
                                               Phone:  (312) 353-7390
                                               Facsimile: (312) 353-7398

                                               Attorneys for Plaintiff
                                               U.S. Securities and Exchange Commission

## CERTIFICATE OF SERVICE

I hereby certify that I provided service of the foregoing Memorandum, via ECF filing, to

counsel for Defendant Slowinski on November 14, 2019.


 /s/ Benjamin Hanauer
Benjamin J. Hanauer
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Phone:  (312) 353-7390
Facsimile: (312) 353-7398

One of the Attorneys for Plaintiff