UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>GEORGE SLOWINKSI, )<br>)<br>Defendant. ) | No. 1:19-CV-03552<br><br>Judge Edmond E. Chang |

**MEMORANDUM OPINION AND ORDER**

The Securities and Exchange Commission brought this action against George Slowinski, alleging violations of federal securities laws in connection with an investment scheme.[1] R. 1.[2] Slowinski entered a bifurcated settlement in which he already agreed to an injunction against future securities-laws violations. R. 18-2, ¶ 2. The bifurcated settlement also provides that the Court shall decide, via written motion, the SEC's request for financial remedies. *Id.* ¶ 3. The SEC asks for disgorgement with prejudgment interest and for civil penalties. R. 24. For the reasons explained in this Opinion, Slowinski is ordered to pay $339,000 for disgorgement with $84,107 in prejudgment interest, as well as $84,750 in civil penalties.

**I. Background**

For purposes of this motion, the allegations in the complaint are accepted by Slowinski as true. R. 18 ¶ 4. This enforcement action arises out of a scheme to defraud

---

[1]The Court has subject matter jurisdiction under 28 U.S.C. § 1331
[2]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

hundreds of investors who were promised significant returns from real-estate development projects in Chicago's South Side. The vehicle for the fraud was a real-estate investment venture called Rebuilding America. R. 1, Compl. ¶¶ 17, 20. Slowinski was a principal and one-third owner of Rebuilding America by way of RealProp Chicago, LLC, of which Slowinski was the sole shareholder *Id.* ¶ 17; R. 25-1, Tushaus Decl. ¶ 6; R. 33-1, Slowinksi Aff. ¶¶ 2, 8. Slowinski also partially owned real-estate development companies G-Slow Construction, LLC, and G-Slow Real Estate (together, the G-Slow companies). Slowinski Aff. ¶ 3. As part of the venture, Slowinski agreed that G-Slow Real Estate would acquire properties using funds raised by Rebuilding America, while G-Slow Construction would act as general contractor for the acquired properties. Compl. ¶ 23. The G-Slow companies also operated development projects unrelated to Rebuilding America. *See* Slowinski Aff. ¶ 7; Compl. ¶¶ 68, 72.

In the summer of 2013, Slowinski and his partners (the Complaint refers to them collectively as the "principals") devised the key aspects of the offering. Compl. ¶ 21. To entice investors, Rebuilding America's principals agreed to advertise a 38% return on capital over two years. *Id.* ¶ 24. This is despite the fact that Slowinski expressed concerns that the promised return was untenable for the "full-gut" rehab projects being promoted. *Id.* ¶ 78. At the same time, Slowinski and the principals agreed to take between 34% to 42% of all investments in the form of undisclosed fees. *Id.* ¶¶ 25–26. Slowinski would personally receive between 2.3% to 3% of every dollar invested in Rebuilding America. *Id.* ¶ 25.

Slowinski played a significant role in the offering. He agreed to serve as Rebuilding America's registered agent and oversee day-to-day operations through his real estate and construction companies. Compl. ¶ 22. He also reviewed drafts of the investment contracts, referred to as "Cycle Agreements." *Id.* ¶ 28. Through live presentations, Rebuilding America promoted the offering to prospective investors in Singapore and Malaysia. *Id.* ¶ 30. Slowinski participated in multiple investor-solicitation presentations in September 2013 and February 2014. *Id.* ¶ 32. These events touted Slowinski's experience in the Chicago real estate market, describing him as an expert in flipping properties who had developed a "proven," "well defined," and "methodical" system. *Id.* ¶ 34. In reality, Slowinski had less than one year of experience buying and rehabbing the types of real estate projects promoted by Rebuilding America. *Id.* ¶ 80.

At no time were investors informed that at least 34% of their investments would go directly to Slowinski and the principals via hidden fees and commissions. Compl. ¶ 38. Investors were asked to sign Cycle Agreements with Rebuilding America, based on the representations that the company would use investments to "purchase … various residential properties located in the United States for the purpose of refurbishing same and resale." *Id.* ¶ 41. The Cycle Agreements also represented that investors would see 18% returns after year one and 20% returns after year two. *Id.* ¶ 43.

By April 2014, Rebuilding America raised more than $20.7 million from investors in Asia. Compl. ¶ 45. At this point, Slowinski and the principals shared concerns

about the ability to generate sufficient profits to repay investors, so Rebuilding America stopped raising money in Asia. *Id.* But despite these concerns, by April 2014, Slowinski and the principals raised an additional $194,000 from three Australian investors. *Id.* ¶ 46. As with the investors in Asia, Rebuilding America told the Australian investors that it would put money towards buying and selling real estate to achieve a 38% return over two years. *Id.* ¶ 47. Once again, it concealed the fact that at least 30% of the investment would go directly into the pockets of Slowinski and the principals. *Id.* ¶ 48. Eventually, in a pyramid-style payout, Rebuilding America distributed the 18% year-one return out of investment principal as opposed to profit. *Id.* ¶¶ 49; 90. Beyond this raid of investment principal to make a year-one payment, investors received no additional returns. *Id.*

Meanwhile, between October 2013 and January 2015, G-Slow Construction received around $7.1 million in construction draws from Rebuilding America. Compl. ¶ 67. Out of that amount, Slowinski directed $2.8 million for uses unrelated to Rebuilding America properties. *Id.* ¶ 68. This included payroll, overhead, general business expenses, and cost overruns on *other* projects not run by Rebuilding America. *Id.* ¶ 72.

By September 2014, Rebuilding America had sold only three properties, all at a loss. *Id.* ¶ 94. And from October 2015 through April 2015, at the same time it was making first-year interest payments to certain investors, Rebuilding America sold 21 homes at a combined approximate loss of $4.1 million. *Id.* ¶ 95. By 2017, Rebuilding

4

American ceased its development activities, leaving investors with more than $17 million in losses. *Id.* ¶¶ 97–98.

In May 2019, the SEC brought this enforcement action against Slowinski, alleging violations of Rule 10(b)-5, Section 17(a) of the Securities Act, as well as aiding and abetting violations of each of those laws. Comp. ¶¶ 99–116. Slowinski agreed to a bifurcated settlement that enjoined him from further violation of securities laws. R. 18; R. 23. Under the settlement, Slowinski also agreed to pay disgorgement, prejudgment interest, and civil penalties in an amount determined by the Court through motion practice. R. 23 at 3. For purposes of this motion, Slowinski also agreed to accept as true the allegations in the SEC's complaint. R. 18, ¶ 4.

The SEC has now moved the Court to impose a disgorgement amount of $339,000, pre-judgment interest of $84,107, and "maximum" third-tier civil penalties. R. 25, Gov. Br. at 11, 13.

## II. Analysis

### A. Disgorgement

Disgorgement is a remedy "designed both to deprive a wrongdoer of unjust enrichment and deter others from violating the securities laws." *SEC v. Michel*, 521 F. Supp. 2d 795, 830 (N.D. Ill. 2007); *see also SEC v. DeMaria*, No. 12 C 4145, 2013 WL 4506867, *1 (N.D. Ill. Aug. 22, 2013); *SEC v. Black*, No. 04 C 7377, 2009 WL 1181480, *2 (N.D. Ill. Apr. 30, 2009). It is not a punitive measure. *Rowe v. Maremon Corp.,* 850 F.2d 1226, 1241 (7th Cir. 1988). A district court "has broad discretion in setting the amount of a disgorgement award, and the amount need not be exact." *SEC v. Seven*

5

*Palm Inv., LLC*, No. 10 C 2755, 2014 WL 1292377, *2 (N.D. Ill. Mar. 31, 2014). Salaries and other forms of compensation may be disgorged. *Black*, 2009 WL 1181480 at *2 (citing *SEC v. Koenig*, 557 F.3d 736, 744-45 (7th Cir. 2009));

The SEC bears the burden of establishing its entitlement to the requested remedies by a preponderance of the evidence. *See Steadman v. SEC,* 450 U.S. 91, 103 (1981). Again, because punishment is not its goal, disgorgement is a form of *restitution* measured by the defendant's wrongful gain. *Kokesh v. S.E.C.,* 137 S. Ct. 1635, 1640 (2017). But disgorgement need only be a reasonable approximation of profits causally connected to the violation. *S.E.C. v. First City Fin. Corp.,* 890 F.2d 1215, 1231 (D.C. Cir. 1989). "[A] monetary award often depends on estimation, for defendants may not keep (or may conceal) the data required to make an exact calculation." *QT, Inc.*, 512 F.3d 858, 864 (7th Cir. 2008). Once the government provides a reasonable estimate, the defendants bear the burden of showing that the estimate is inaccurate. *See id.*

The SEC's requested disgorgement, supported by the declaration of its Staff Accountant Ann Taushaus (R. 25-1, Tushaus Decl.), is the amount that RealProp (one of the entities owned by Slowinski) received from Rebuilding America between December 14, 2013 and June 2014. Gov. Br. at 11. According to Tushaus, Slowinski spent some of this amount on personal expenditures including dining, travel, clothing, jewelry, tobacco, personal taxes, cash withdrawals, and direct payments to himself and family members. *Id.*; Tushaus Decl. ¶¶ 8–9. Tushaus calculated the disgorgement amount based on her review of voluminous financial records, including bank

6

records for Rebuilding America, G-Slow Construction, G-Slow Real Estate, and Real-Prop. Tushaus Decl. ¶ 5.

In response, Slowinski contests the SEC's disgorgement calculation, contending that he personally pocketed far less than $339,000. R. 33, Def. Resp. Br at 2. According to Slowinski, although RealProp had received a total of $593,516.82 from Rebuilding America, this was redirected to offset expenses incurred by G-Slow Construction and G-Slow Real Estate. *Id.* at 3. As a result, Slowinksi states that he personally benefited to the tune of around $79,000. Slowinski Aff. ¶ 11.

The first question is whether the SEC provided a reasonable estimate of Slowinski's ill-gotten gains. On review of the record, the SEC's method of calculating the $339,000 disgorgement is a valid way of determining personal gain. The proposed disgorgement amount reflects the distributions made from Rebuilding America to RealProp, of which Slowinski was the sole shareholder. Tushaus Decl. ¶ 6; Slowinksi Aff. ¶¶ 2, 8. The total sum of proceeds flowing to a solely owned entity can reasonably represent the total financial benefit received by the sole owner, even if he or she only personally spends a part of the funds. *See Sec. & Exch. Comm'n v. Durham,* 799 F. App'x 928, 930 (7th Cir. 2020) ("to calculate disgorgement, courts focus on the sum derived through the fraud, not on how the fraudster used the money."); *S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1476 (2d Cir. 1996) (firm's sole shareholder was jointly and severally liable for amounts disgorged from firm, even though it was more than the amount he personally received). According to Tushaus, from December 14, 2013 to January 31, 2015, funds received from Rebuilding America accounted for

7

99.2% of the total deposits in RealProp during that period. Tushaus Decl. ¶ 8. And at his deposition, Slowinski testified that RealProp had no purpose other than to receive funds from Rebuilding America. R. 34-2, Slowinski Dep. at 604:14-21; 832:12-15. For these reasons, the funds received by RealProp represent a reasonable estimate of Slowinksi's gain from the fraud.

The next question is whether Slowinksi met his burden of showing the inaccuracy of the SEC's estimation. The answer is no. Slowinski contends that he personally profited to the tune of only $79,000, but he provides no supporting evidence. Slowinski Aff. ¶ 11. All he says is that he has requested bank records that will support his proposal. *Id.* But he never did offer those purported bank records into the record (despite plenty of time to do so). Whatever the reason for the missing records, Slowinski has offered insufficient evidence to rebut the SEC's calculation.

Slowinski also contends that distributions made to RealProp were rerouted to G-Slow Construction and G-Slow Real Estate to pay for overhead expenses. Def. Resp. Br. at 3. That means, supposedly, that he did not personally pocket an amount anywhere near $339,000. *Id.* Slowinski avers that between August 2013 through June 2015, his G-Slow companies incurred $557,350.30 in expenses on behalf of Rebuilding America. Slowinski Aff. ¶ 7. He also avers that RealProp received a total of $593,516.82 from Rebuilding America. *Id.* at 8. Without providing any documentation of money flowing from RealProp to G-Slow companies, Slowinski suggests that distributions to RealProp should somehow be offset by the expenses incurred by the G-Slow companies on behalf of Rebuilding America. Def. Resp. at 3.

8

Slowinski seems to argue that business expenses are excludable from the disgorgement amount. It is true that, in the right circumstances, "courts may not enter disgorgement awards that exceed the gains made upon any business or investment, when both the receipts and payments are taken into the account." *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1949–50 (2020). Here, however, there are problems with this type of credit for expenses. First, the G-Slow companies' expenses on behalf of Rebuilding America do not represent legitimate credits when both entities were intimately involved in the scheme: Rebuilding America was the vehicle for the fraud and the G-Slow companies helped the fraud along by performing a modicum of work while Slowinski and the other principals pocketed enormous proceeds from investors. According to allegations in the Complaint, which Slowinksi accepts as true, the G-Slow companies identified, purchased, and provided general contracting services for Rebuilding America investment properties. Compl. ¶ 23. Because fraud permeated the G-Slow companies, Slowinski is not entitled to offset their expenses. *See SEC v. British Am. Commodity Options Corp.,* 788 F.2d 92, 93 (2d Cir. 1986) (disgorgement of all sole shareholder's profits from brokerage is appropriate even without dollar for dollar accounting of illegally deprived profits where fraud was systemic and pervasive).

Second, redirecting funds to pay G-Slow payroll and overhead does not somehow extinguish Slowinski's pecuniary interest in those funds. Slowinski is a partial owner of G-Slow Construction and G-Slow Real Estate, which were involved in ventures aside from Rebuilding America. Compl. ¶¶16, 68–69, 72.; Slowinski Aff. ¶¶ 3, 7. Between October 2013 and January 2015, G-Slow Construction received around

9

$7.1 million in construction draws from Rebuilding America. Compl. ¶ 67. Out of that amount, Slowinski directed $2.8 million for unrelated uses. *Id.* ¶68. This included payroll, overhead, general business expenses, and cost overruns on projects *not* connected with Rebuilding America. *Id.* ¶ 72. So Slowinski funneled funds from Rebuilding America's investors to cover unrelated business expenses for companies that he partially owns. *Id.* ¶¶ 3, 68–69, 72; Slowinski Aff. ¶¶, 3 7. Because Slowinski had an interest in the profitability of those companies, cost offsets to their general operations still amount to his personal gain.

Third, Slowinski's math does not add up. Slowinski avers that RealProp received a total of $593,516.82, which as a starting point is greater than the $339,000 in distributions calculated by the SEC. Slowinski Aff. ¶ 8. Even assuming Slowinski is entitled to offset all of G-Slow expenses incurred on behalf of Rebuilding America, that leaves a surplus of $36,166.52. *Id.* ¶ 8; Def. Resp. at 3. Without any of the bank records that Slowinski purportedly requested, this is inconsistent with his argument that he personally benefited by around $79,000. Slowinski Aff. ¶ 11. The figures that he proposes are unreliable.

For all of those reasons, the Court imposes a disgorgement amount of $339,000 with prejudgment interest of $84,107, in accordance with the IRS underpayment rate.[3] Tushaus Decl. at 5.

---

[3]The Court need not consider the SEC's alternative disgorgement calculation of $100,523 that was in part based on Slowinski's personal-benefit argument. R. 34, Gov. Suppl. Resp. at 4-5.

**B. Civil Penalty**

The SEC also requests "maximum" civil penalties in accordance with the statutory metric. Gov. Br. at 13. Here, third-tier penalties are available given that the violation "involves fraud deceit, or manipulation" resulting in "substantial losses … to others." 15 U.S.C. §§ 77t(d)(2)C), 78u(d)3)(B)(iii). For the period at issue, the maximum third-tier penalty is the higher of $150,000 per violation; or (2) the gross amount of pecuniary gain. *See*, 17 C.F.R. § 201.1001, Table I. The SEC has not proposed an exact penalty amount. But the SEC contends that courts have interpreted "per violation" broadly and in some instances have imposed a third-tier penalty for *each* investor defrauded. Gov Br. at 12. Again, however, the SEC has not proposed a specific or discernable basis to determine a "per violation" penalty. For his part, Slowinksi requests that the Court impose a "minimal" civil penalty that accounts for his financial condition, his age, and other mitigating factors. Def. Resp. Br. at 4-5. But Slowinski too does not propose an exact penalty amount.

Subject to the statutory maximum, the penalty "shall be determined by the court in light of the facts and circumstances" of the case. *See* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3); 15 U.S.C. § 80b-9(e). In determining a civil penalty for violations of federal securities law, a court should generally consider factors such as the seriousness of the violation; the defendant's state of mind when committing the violations; the repeated nature of the violations; whether the defendant has admitted wrongdoing; the losses or risk of losses caused by the conduct; any cooperation provided to enforcement authorities; and ability to pay. *SEC v. Williky*, 942 F.3d 389,

11

393 (7th Cir. 2019). In deciding the amount of the penalty, a court may also consider any other penalties already imposed against the defendant and the defendant's ability to pay. *See SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007).

Slowinski attempts to present several mitigating factors. First, he downplays his role in the scheme and asserts that he tried to "mitigate[] losses by continuing to work on the project even though the project was not generating a positive cash flow." Def. Resp. at 4. This is not persuasive. The complaint establishes that Slowinski played a major role in the fraud. He owned a one-third interest in Rebuilding America, used his construction companies to run day-to-day operations, received personally between 2.3% to 3% of every dollar invested in Rebuilding America, reviewed drafts of the Cycle Agreements, and participated in presentations in which he was held out as a real-estate expert. Compl. ¶¶ 16, 17, 21, 28, 32–33. And there is also no factual basis establishing that Slowinski attempted to mitigate investor losses. In fact, Slowinksi diverted investor money away from Rebuilding America investment properties to cover costs on unrelated projects. *Id*. ¶¶68–72. If anything, the fact that Slowinski continued working on the venture could just as easily imply prolonging the fraud to reap more proceeds from investors.

Second, Slowinski contends that he cooperated "extensively" with the SEC investigation. Def. Resp. Br. at 4. Slowinski explains that he met with SEC Attorneys for a few days, responded in good faith to their questions, and handed over numerous documents without asserting privilege. *Id*. But it is not particularly compelling to admit to a fraud that is readily provable through financial records (over which there

12

is no privilege). And nothing in the factual record shows that Slowinski assisted the SEC in any investigation of the *other* principals. Also, although Slowinski has consented to injunctive relief, he has not actually *admitted* the allegations in the complaint. R. 23 at 1. He has only *accepted* as true the allegations in the complaint, and just for purposes of determining monetary remedies. *Id.* at 3. As a result, Slowinski is not deserving of significant mitigation for cooperation or for admitting guilt. *See Williky*, 942 F.3d at 393.

Lastly, Slowinski contends that he is unable to pay a significant amount for a civil penalty. Def. Resp. at 4. According to a personal finance statement dated February 2, 2020, Slowinski has a net worth of negative $33,900. Slowinski Aff. at 18. Slowinski also states that he lost his home and businesses in bankruptcy proceedings, and his remaining interest in two Rebuilding America properties are under the control of a court-appointed receiver who may sell those property to repay investors. Def. Resp. at 4–5.

It is true that Slowinski's insolvency and his age (69 years old) are mitigating. But he did knowingly participate in key aspects of a fraud scheme in his 60s, so he should have understood the risks and potential penalties that arise from a $17-million fraud spread amongst around 600 victim-investors. Compl. ¶¶ 1, 17. In light of his insolvency, however, imposing the maximum tier-three penalty on a "per investor" would represent an excessive penalty. And the SEC does not propose a specific penalty or a "per violation" basis of determining one. On balance, the Court imposes a civil penalty of $84,750, which is equal to 25% of the disgorgement amount.

## III. Conclusion

For the reasons explained in this Opinion, the SEC's motion for disgorgement, prejudgment interest, civil penalties, and entry of final judgment is granted as follows: Slowinski is ordered to pay $339,000 in disgorgement; $84,107 in prejudgment interest; and $84,750 in civil penalties. The tracking status hearing set for December 4, 2020 is vacated, and the Court will enter final judgment.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 29, 2020